**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| DARRYL GRAY, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CITY OF SAINT LOUIS, MISSOURI, | )   Cause No.: 4:18-cv-01678-JCH |
| COL. JOHN HAYDEN, in his | ) |
| individual capacity, | )   JURY TRIAL DEMANDED |
| DET. RONALD VAUGHAN, in his | ) |
| individual capacity, and | ) |
| DET. LARRY WENTZEL, in his | ) |
| individual capacity, | ) |
| | ) |
|     Defendants. | ) |

**SECOND AMENDED COMPLAINT**

Pursuant to Federal Rule of Civil Procedure 15(a)(2), Plaintiff files this Second Amended

Complaint. On September 29, 2017, Detectives Ronald Vaughan and Larry Wentzel of the St.

Louis Metropolitan Police Department pepper sprayed, body slammed, and unconstiutionally

arrested Plaintiff Darryl Gray ("Reverend Gray") without warning, without justification, and for

punitive reasons, while Chief John Hayden looked on. Reverend Gray, a member of the clergy and

one of the most recognizable proponents of non-violence in the region, was not breaking any laws

and was exercising his First Amendment rights.

**JURISDICTION AND VENUE**

1.    Plaintiff brings this claim pursuant to 42 U.S.C. § 1983, the Fourteenth Amendment

to the United States Constitution, and the First and Fourth Amendments, as incorporated as against

States and their municipal divisions through the Fourteenth Amendment.

1

2.      The jurisdiction of this Court is proper, pursuant to 28 U.S.C. § 1331, because Plaintiff's action arises under the Constitution of the United States and § 1343(a)(3) to redress the deprivation of rights secured by the Constitution of the United States.

3.      Venue is proper in the United States District Court for the Eastern District of Missouri pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in the City of St. Louis.

4.      Divisional venue is proper in the Eastern Division because a substantial part of the events leading to the claims for relief arose in the City of St. Louis and Defendants reside in the Eastern Division. E.D. Mo. L.R. 2.07(A)(1), (B)(1).

5.      This Court has supplemental jurisdiction over the included Missouri state law claims pursuant to 28 U.S.C. §1367.

6.      Plaintiff demands a trial by jury pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

7.      Defendant the City of St. Louis, Missouri (hereinafter, "City of St. Louis") is a first-class city, and a political subdivision of the State of Missouri duly organized under the Constitution of Missouri.

8.      The St. Louis Metropolitan Police Department ("SLMPD") is an instrumentality of the City of St. Louis, Missouri organized and controlled pursuant to the Statutes of the State of Missouri.

9.      The Public Facilities Protection Corporation of the City of St. Louis insures the SLMPD.

10.    John Hayden is the current chief of police of the SLMPD. Mr. Hayden has the rank of colonel. Mr. Hayden was on the ground supervising SLMPD officers during the events of September 29, 2017. At the time, his rank was major.

11.    Ronald Vaughan is employed as a detective with the SLMPD. He was on duty and on the scene during the events of September 29, 2017. Mr. Vaughan used excessive force on Plaintiff.

12.    Larry Wentzel is employed as a detective with the SLMPD. Mr. Wentzel was on duty and on the scene during the events of September 29, 2017. Mr. Wentzel used excessive force on and unlawfully arrested Plaintiff.

13.    Plaintiff is a clergymember and resident of the City of St. Louis.

## FACTS

### A.    Backdrop of Stockley Verdict

14.    On Friday, September 15, 2017, after a four-day bench trial, a Missouri Circuit Court Judge acquitted Officer Jason Stockley of the first-degree murder of Anthony Lamar Smith. *See* Exh. A, Stockley Verdict.

15.    This acquittal shocked many in the St. Louis community as an audio recording submitted into evidence in the trial captured Officer Stockley saying "we're killing this motherfucker, don't you know" in reference to Mr. Smith. *Id*. at 5.

16.    Further, evidence showed that during the incident Officer Stockley was in possession of an assault rifle that had not been issued to him by the SLMPD. *Id*. at 23.

17.    In addition, Officer Stockley claimed to find a gun in Mr. Smith's car after he killed Mr. Smith. *Id*. at 25.

18.     Only Officer Stockley's DNA was found on the gun, leading many, including the Circuit Attorney of the City of St. Louis, to believe that Stockley planted the gun on Mr. Smith after Mr. Smith's death, in an effort to justify the killing. *Id*. at 12.

19.     At trial, Officer Stockley's partner did not testify in Stockley's defense. Rather, the partner invoked his Fifth Amendment right against self-incrimination.[1]

### B.     Protests Begin After the Verdict

20.     Following the announcement of the Stockley Verdict, public protests began at multiple locations in St. Louis and surrounding communities.

21.     To many in the St. Louis community, Officer Stockley's acquittal was yet another example of white St. Louis-area police officers killing African-American citizens with impunity.

22.     Further, in the view of the protestors, the acquittal further supported their view that the American criminal justice system does not believe that Black lives matter.

23.     In response to the protests, St. Louis Metropolitan police officers amassed at several protests wearing military-like tactical dress, helmets, batons, and full-body riot shields and carrying chemicals, such as tear gas, skunk, inert smoke, pepper gas, pepper pellets, xylyl bromide, and/or similar substances (collectively, "chemical agents").

24.     This is in stark contrast to SLMPD's appearance at a multitude of other un-permitted protests where the police themselves are not the target of the protest, including an anti-Donald Trump march on November 13, 2016, the St. Louis Women's March on January 21, 2017,

---

[1] *See* Joel Currier, *Partner of Ex-St. Louis Cop Charged with Murder is Given Immunity, Ordered to Testify*, St. Louis Post-Dispatch, Jul 27, 2016, available at http://www.stltoday.com/news/local/crime-and-courts/partner-of-ex-st-louis-cop-charged-with-murder-is/article_b85140b8-3744-55fb-83ee-3d9474cc70b3.html.

the St. Louis LGBTQIA March and Rally on February 22, 2017, and the St. Louis March for Science on April 22, 2017.

25.    Virtually all of the protests were non-violent.

26.    On three occasions, a handful of protesters committed minor property damage, including broken windows and broken flower pots.

27.    During the Stockley protests, SLMPD police officers *without warning* deployed chemical agents against individuals observing, recording, or participating in protest activity, including but not limited to the following:

a.    The afternoon of Friday, September 15, 2017, near the intersection of Clark and Tucker Avenues.

b.    The evening of Friday, September 15, 2017, near the intersection of McPherson and Euclid Avenues.

c.    The evening of Friday, September 15, 2017, near the intersection of Waterman and Kingshighway Boulevards.

d.    The evening of Friday, September 15, 2017, near the intersection of Lindell and Euclid Avenues.

e.    The evening of Friday, September 15, 2017, near the intersection of Euclid and Maryland Avenues.

f.    The evening of Friday, September 15, 2017, near the intersection of Lindell and Kingshighway Boulevards.

g.    The evening of Friday, September 15, 2017, near the intersection of Euclid Avenue and Pershing Place.

h.    The evening of Friday, September 15, 2017, on Hortense Place.

i.    The evening of Sunday, September 17, 2017, near the intersection of Tucker Boulevard and Washington Avenue.

j.    The evening of September 29, 2017 outside of Busch Stadium.

28.    These incidents are consistent with the pattern and practice of SLMPD of indiscriminately using chemical agents without warning.

### C.    Post-Ferguson Federal Court Proceedings

29.    In October 2014, SLMPD fired chemical agents at protestors on South Grand.

30.    In November 2014, SLMPD officers fired chemical agents at protestors on South Grand as well as into a business where peaceful protestors had congregated. SLMPD officers refused to allow the protestors to leave.

31.    On December 11, 2014, a federal judge in this District issued a temporary restraining order enjoining the SLMPD from enforcing any rule, policy, or practice that grants law enforcement officials the authority or discretion to:

(1)    utilize tear gas, inert smoke, pepper gas, or other chemical agents (collectively, "chemical agents") for the purpose of dispersing groups of individuals who are engaged in peaceful, non-criminal activity in the City of St. Louis or in the County of St. Louis

      (a)    without first issuing clear and unambiguous warnings that such chemical agents will be utilized;
      (b)    without providing the individuals sufficient opportunity to heed the warnings and exit the area;
      (c)    without minimizing the impact of such chemical agents on individuals who are complying with lawful law enforcement commands; and
      (d)    without ensuring that there is a means of safe egress from the area that is available to the individuals; and

(2)    utilize chemical agents on individuals engaged in peaceful, non-criminal activity in the City of St. Louis or in the County of St. Louis for the purpose of frightening them or punishing them for exercising their constitutional rights.

*See* Exh. B, Temporary Restraining Order in *Templeton v. Dotson*, No. 4:14-cv-02019 (E.D. Mo.

Dec. 11, 2014) at 3.

32.    The City entered into a settlement agreement on March 25, 2015, where it agreed

as follows:

A.    Defendants and their agents, servants, employees, and representatives, will
not enforce any rule, policy, or practice that grants law enforcement officials the authority
or discretion to:

(1)    utilize tear gas, inert smoke, pepper gas, or other chemical agents
(collectively, "chemical agents") for the purpose of dispersing groups of
individuals who are engaged in non-criminal activity:

(a)    without first issuing clear and unambiguous warnings that
such chemical agents will be utilized;
(b)    without providing the individuals sufficient opportunity to
heed the warnings and exit the area;
(c)    without reasonably attempting to minimize the impact of
such chemical agents on individuals who are complying with lawful law
enforcement commands; and
(d)    without ensuring that there is a means of safe egress from the
area that is available to the individuals and announcing this means of egress
to the group of individuals.

(2)    utilize chemical agents on individuals engaged in non-criminal
activity for the purpose of frightening them or punishing for exercising their
constitutional rights.

B.    Provided, however, that Paragraph A hereof shall not be applicable to
situations that turn violent and persons at the scene present an imminent threat of bodily
harm to persons or damage to property, and when law enforcement officials must defend
themselves or other persons or property against such imminent threat.

*See* Exh. C, Settlement Agreement in *Templeton v. Dotson*, No. 4:14-cv-02019 (E.D. Mo. Mar.

25, 2015) at 1-2.

## D.    SLMPD Violations of the Consent Decree

33.    Less than two months after entering into this Consent Decree, SLMPD began to

violate the Decree.

34.     On May 19, 2015, in response to protests over the St. Louis Circuit Attorney's office's refusal to charge another SLMPD officer for killing another African-American man, SLMPD officers deployed chemical agents against peaceful, non-criminal protestors without warning. *See* Exh. D, Transcript of Testimony, Volume 1, *Ahmad v. St. Louis*, No. 4:17-cv-02455 (E.D. Mo. Oct. 18, 2017) at 69.

35.     On August 19, 2015, a protest occurred because SLMPD officers killed another African-American man in the Fountain Park neighborhood. According to the testimony of Sarah Molina, a local attorney, SLMPD officers indiscriminately used chemical agents without giving an audible and intelligible warning at the intersection of Walton Avenue and Page Boulevard. *Id.* at 50-52. Molina testified that SLMPD officers fired chemical agents at her without giving her an opportunity to leave. *Id.* SLMPD officers continued using chemical agents against people fleeing the area and even fired chemical agents at people peacefully standing on or in their own properties. *Id.* Thirty minutes after the protests had dissipated, SLMPD officers returned and fired chemical agents at Ms. Molina, who was standing on property that she owns. *Id.*

36.     On July 21, 2017, SLMPD officers used chemical agents against people protesting the treatment of detainees in the St. Louis City Workhouse. *Id.* at 71, 91. Although a few people did engage in unlawful activity earlier in the night, SLMPD officers pepper sprayed numerous people, none of whom were involved in criminal activity or were even at the same location as the criminal activity. These protesters were engaged in non-violent protesting when SLMPD officers sprayed them with chemical agents. *Id.*

37.     Defendants' action in the instant matter follows the same script whereby SLMPD officers violate the Constitutional rights of people expressing their First Amendment right to protest against the police. Defendants' pattern and practice of illegally arresting and using

8

chemical munitions against peaceful citizens is not only well-documented, but is detailed in *Ahmad* and *Templeton.*

### E.    The September 29, 2017 Protest

38.    This pattern and practice of utilizing chemical agents on individuals engaged in peaceful, non-criminal activity continued on September 29, 2017.

39.    On September 29, 2017, at around 7:00 PM, individuals began gathering and protesting outside Busch Stadium while a St. Louis Cardinals game took place inside the stadium.

40.    Throughout the course of several hours, the protestors marched up and down various streets of downtown protesting police violence. SLMPD blocked street intersections and regulated pedestrian and traffic flow during the demonstrations.

41.    At some point during the evening, but prior to any arrests, protestors lawfully and peacefully entered Busch Stadium with tickets and unfurled a giant banner as a sign of protest of police violence.

42.    Shortly thereafter, the protestors inside Busch Stadium voluntarily left the premises and rejoined other protestors marching near the Stadium and Ballpark Village. These marches were peaceful.

43.    SLMPD's Civil Disobedience Team appeared on the scene to join uniformed and bicycle SLMPD officers already present. To this point, there had been no reports of violence attributable to the protestors.

44.    SLMPD's Civil Disobedience Team was comprised of officers wearing military-like tactical dress, including helmets. These officers carried long wooden batons and full-body riot shields.

45.    Around 9:00 PM, some protestors who had been marching along various streets in downtown began making their way back towards Busch Stadium moving south on Broadway towards the intersection of Walnut Street and Broadway.

46.    Soon after the protestors arrived around the intersection of Broadway and Walnut, SLMPD began indiscriminately using pepper spray on civilians without provocation of violence or criminal behavior. Among the civilians SLMPD pepper sprayed were members of the clergy, elected officials, and disabled persons.

47.    Video evidence shows that protestors acted peacefully and calmly when a few protestors crossed the intersection of Walnut walking south.

48.    As Reverend Gray approached the intersection, he observed an SLMPD officer roughly grab a female clergymember.

49.    He immediately began to protest the rough treatment of the clergymember, telling officers to stop manhandling her.

50.    In response, the officers yelled, "We are sick of this!"

51.    Then, Defendant Vaughan shoved Reverend Gray with two hands to the chest.

52.    Defendant Vaughan is well known in the St. Louis community because he was one of the two officers who shot and killed Mansur Ball-Bey on August 19, 2015.

53.    Defendant Vaughan then pepper sprayed Reverend Gray without warning.

54.    Seconds later, Defendant Wentzel violently body slammed Reverend Gray to the ground, breaking Reverend Gray's glasses.

55.    Once on the ground, Reverend Gray felt Defendant Wentzel's knee pressed painfully into his back.

56.    Reverend Gray loudly tried to tell the officers that he had a previously injured shoulder.

57.    Reverend Gray repeatedly asked "Why am I being arrested?" In response, Defendant Wentzel falsely accused Reverend Gray of assaulting a police officer. This perplexed Reverend Gray as all he had done was protest the rough treatment of the female clergymember.

58.    Instantly, protestors began to voice their disapproval of the violent excessive force used against Reverend Gray. Up until that moment, the protest was both calm and rather quiet.

59.    In response to the SLMPD's unwarranted escalation, many people, including protestors, elected officials, people who were just attending the baseball game, and members of the media began to loudly question why the police had decided to use violence when it was clearly unwarranted.

60.    At that time, two officers began to chase one of the protestors, Calvin Kennedy.

61.    Video evidence shows that Mr. Kennedy was not being violent toward any officer. Within 15 seconds, Defendant Vaughan had a hold of Mr. Kennedy's T-shirt.

62.    The video evidence also shows that the officers did not give Mr. Kennedy any verbal commands.

63.    Without warning, Defendant Vaughan proceeded to shoot Mr. Kennedy with a Taser while Mr. Kennedy was being grabbed by the officer.

64.    In reaction to the Tasering, protestors began demanding answers to why SLMPD deployed a weapon that has been cited as a factor in over 1,000 deaths.[2]

---

[2] See *Reuters Finds 1,005 Deaths in U.S. involving Tasers, Largest Accounting to Date*, Reuters, Aug 22, 2017, available at:
https://www.reuters.com/article/us-axon-taser-toll/reuters-finds-1005-deaths-in-u-s-involving-tasers-largest-accounting-to-date-idUSKCN1B21AH

65.     The only white shirt supervisor seen during the course of the video is Chief Hayden, who is seen standing approximately five feet away from where Revereand Gray was tackled.

66.     During this whole incident, Defendant Hayden can be observed in the middle of the officers wearing a white shirt indicating that he is a supervisor. Defendant Hayden took no steps to prevent his officers from inflicting punishment on peaceful protestors and members of the media. In fact, Chief Hayden is observed in the video using a cell phone to record the activities and the police response.

67.     Reverend Gray was then transported to the St. Louis Justice Center.

68.     Upon arrival, he asked for medical treatment to clean the pepper spray out of his eyes.

69.     Nearly five hours later, a nurse came to see Reverend Gray. Instead of providing medical care, she told him to put his head over the sink and wash his eyes out with cold water.

70.     Although his knees were bleeding and he had reported the injury to his jailers, the nurse did not look at his knees.

71.     At approximately 5:30 AM, 8.5 hours after his arrest, Reverend Gray was released from jail.

72.     Reverend Gray's summons initially showed that he was charged with Resisting a Police Officer and Assaulting a Police Officer. Someone scratched out those charges and changed them to a single charge of interfering with a police officer.

73.     In response to the deployment of pepper spray, SLMPD released a statement that read in part, "Officers deploy tactics when criminal activity arises and escalation depends on the

level of aggression. […] Pepper spray is a non-lethal tool used when unlawful behavior occurs to protect life and property."[3]

74.      This statement flies in the face of what really happened. There was no unlawful behavior that required pepper spraying. At worst, individuals may have been jaywalking. No life or property was in danger until SLMPD Tasered a person without warning and then used pepper spray in a punitive manner.

75.      Defendant Vaughan filed a false police report claiming that he was attacked, that the road was closed to protestors although video evidence shows police escorting hundreds of protestors passed this same intersection, and claiming that he feared for his safety when he was the actual aggressor.

### F.      The Police Department Intentionally Ignored Its Own Policies

76.      When detaining individuals in custody who require medical care, the City of St. Louis and its SLMPD has established the following policy:

PRISONERS REQUIRING MEDICAL ATTENTION (72.6.1)

1.      A medical emergency is defined as a condition which a reasonable person would expect a result in loss of life or function. Examples of medical emergencies include severe bleeding, fractures with displacement (bone out of alignment), loss of consciousness, non-responsiveness, and respiratory distress, severe chest pain or severe shortness of breath. This list is not all-inclusive. If you have any doubts, contact the on-duty nurse at the City Justice Center for guidance.

2.      Should a prisoner require emergency medical attention, whether the injury or illness occurred during incarceration or not, an Emergency Medical Service (EMS) unit will be requested to respond to the holdover for medical evaluation and if necessary conveyance to the hospital. EMS will determine the destination hospital. An I/LEADS report will be prepared documenting all treatment received by the prisoner. If immediate first aid is administered by a Department employee or the paramedics, the injury and treatment will be noted in the Prisoner's Log Book by the booking clerk.

---

[3] *See* Erin Heffernan, *St. Louis Faith Leaders Criticize Arrest, Pepper-Spraying of Clergyman at Protest*, St. Louis Post-Dispatch, Oct 3, 2017, available at https://www.stltoday.com/news/local/metro/st-louis-faith-leaders-criticize-arrest-pepper-spraying-of-clergyman/article_f065d923-634d-526a-8b0f-45dc443ec1cb.html.

3.      Should a prisoner require <u>non-emergency</u> medical attention, the on-duty nurse at the City Justice Center will be contacted for guidance.
4.      The confidential relationship of doctor and patient extends to prisoner patients and their physician.
5.      In the event a prisoner is injured while in custody or shortly before being taken into custody, the Watch Commander will arrange to have photographs taken of any and all visible injuries. The photographs will be treated as physical evidence. If practical, the photos should be taken both prior to the application of bandages, etc., and after the injury has received appropriate medical attention

<u>PRISONER HEALTH SCREENING</u> (72.6.3)

The following prisoner medical "receiving screening" information will be obtained and recorded on the Field Booking Form when prisoners are booked and verified upon their transfer to another facility or release:

1.      Current health and medical history of the prisoner; (72.6.3.a)
2.      Medication taken by the prisoner; (72.6.3.b)
3.      Known medication/drug allergies.
4.      Behavior, including state of consciousness and mental status; and (72.6.3.c)
5.      Body deformities, trauma markings, bruises, lesions, jaundice (a yellowness of the skin and whites of the eyes), and ease of movement (72.6.3.d)

<u>NOTE:</u>  a copy of the Field Booking Form **must** be attached to the computerized Arrest Register whenever a prisoner is transferred to the City Justice Center.

77.     On information and belief, the SLMPD and City of St. Louis Correctional Staff failed and/or refused to follow this policy when they provided no medical care to any of the people illegally pepper sprayed or who were hurt by the zip-cuffs.

78.     Defendants' decision to ignore the policy constitutes a custom and practice of failing and/or refusing to follow this policy designed to protect the safety and wellbeing of injured individuals in police custody, showing a deliberate indifference by Defendants to the rights of Plaintiff and other injured detainees.

79.     Despite this policy, at no time between their arrest and their release from the St. Louis City Justice Center did any police officer or other city official provide any arrestee with

14

medical care or give anything to them to wash the chemical agents out of their eyes, off their bodies, or off their clothes.

## G.    Federal Court Injunctive Relief

80.    On November 15, 2017, a judge in this District barred SLMPD from using many of the tactics described in this complaint. *See* Exh. E, Memorandum and Order of Preliminary Injunction, *Ahmad v. St. Louis*, No. 4:17-cv-02455 (E.D. Mo. Nov. 15, 2017).

81.    The Court found that "[p]rotest activity began shortly after the announcement of the verdict on the morning of September 15, 2017. Protesters assembled in front of the state courthouse downtown near Tucker and Market streets. They did not have a permit to protest because the City of St. Louis does not require, and will not provide, a permit for protests." *Id*. at 2.

82.    In an attempt to defend the SLMPD's actions, the City's attorney "stated during closing arguments that 'the police have the right to tell people, at this point, we're done for the evening; there's no – no more assembling; this assembly is over.'" *Id*. at 37. Not surprisingly, the Court did not adopt this rationale as a basis for the arrests and the use of chemical agents.

83.    The Court made the following findings:

a.    Plaintiffs are likely to prevail on the merits of their claims that the policies or customs of defendant discussed below violate the constitutional rights of plaintiffs. *Id*. at 35-36.

b.    Plaintiffs have presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant's custom or policy is to permit any officer to declare an unlawful assembly in the absence of the force or violence requirement of St.

Louis City Ordinance 17.16.275 and Mo. Rev. Stat. § 574.060, in violation of plaintiffs' First and Fourth Amendment rights. *Id*. at 36.

      c.      Plaintiffs have presented sufficient evidence for purposes of awarding preliminary injunctive relief that defendant's custom or policy of committing discretionary authority to police officers to declare unlawful assemblies in the absence of any threat of force or violent activity provides no notice to citizens of what conduct is unlawful, and it permits officers to arbitrarily declare "there's no more assembling." *Id*. at 37-38. Plaintiffs have presented sufficient evidence at this stage of the proceedings that this discretion was in fact exercised in such a manner in violation of plaintiffs' constitutional rights. *Id*.

      d.      Similarly, Plaintiffs have presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant's custom or policy is to permit officers to issue vague dispersal orders to protesters exercising their first amendment rights in an arbitrary and retaliatory way and then to enforce those dispersal orders without sufficient notice and opportunity to comply before being subjected to uses of force or arrest, in violation of Plaintiffs' First and Fourth Amendment rights. *Id*. at 39.

      e.      Plaintiffs presented sufficient, credible evidence for purposes of awarding preliminary injunctive relief that defendant has a custom or policy, in the absence of exigent circumstances, of issuing dispersal orders to citizens engaged in expressive activity critical of police which are either too remote in time and/or too vaguely worded to provide citizens with sufficient notice and a reasonable opportunity to comply, inaudible and/or not repeated with sufficient frequency and/or by a sufficient number of officers to provide citizens with sufficient notice and a reasonable opportunity to comply, contradictory and inconsistent, not uniformly enforced, and retaliatory. *Id*. at 40.

f.     Plaintiffs have also presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant has a custom or policy of using chemical agents without warning on citizens engaged in expressive activity that is critical of police or who are recording police in retaliation for the exercise of their first amendment rights, in violation of the First, Fourth, and Fourteenth Amendments. *Id*. at 41.

g.     The City's custom or policy of authorizing the use of hand-held mace against non-violent protesters with no warning or opportunity to comply and in the absence of probable cause or exigent circumstances impermissibly circumvents the protections afforded by the *Templeton* settlement agreement and vests individual officers with unfettered discretion to exercise that authority in an arbitrary and retaliatory manner in violation of constitutional rights. *Id*. at 43-44.

h.     Plaintiffs' evidence — both video and testimony — shows that officers have exercised their discretion in an arbitrary and retaliatory fashion to punish protesters for voicing criticism of police or recording police conduct. When all of the evidence is considered, plaintiffs have met their burden of showing that they are likely to succeed on their claim that defendant has a custom or policy of deploying hand held pepper spray against citizens engaged in recording police or in expressive activity critical of police in retaliation for the exercise of their first amendment rights, in violation of the First, Fourth, and Fourteenth Amendments. *Id*. 44.

i.     Plaintiffs have also presented sufficient evidence at this preliminary stage of the proceedings that the aforementioned customs or policies of defendant caused the violations of plaintiff's constitutional rights. *Id*. 44. That is because "it is well-settled law that a loss of First Amendment freedoms, for even minimal periods of time, unquestionably

17

constitutes irreparable injury" and "it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 691 (8th Cir. 2008) (internal quotation marks and citations omitted), overruled on other grounds, *Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678 (2012). *Id*. 44-45.

84.     Defendant Hayden, as a senior official of the SLMPD on site, directed such actions and conduct and/or tacitly accepted and encouraged such conduct by not preventing officers from engaging in such conduct and by not disciplining them when they did engage in such actions and conduct. Video evidence shows Hayden standing within arm's reach of Defendant Officers while they are violating Plaintiff's rights. Defendant Hayden calmly watches the Defendant Officers' action as if he is supervising to ensure that the officers under his command are executing his orders. Defendant Hayden's recording of the Defendant Officers' violation of Plaintiff's rights further supports a reasonable inference that he is a supervisor documenting that the officers under his command are executing the plan that he and other SLMPD officers directed and/or encouraged.

## COUNT I
### 42 U.S.C. § 1983 – First and Fourteenth Amendment Violations
(Against All Individual Defendants)

85.     Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

86.     Plaintiff has a fundamental right to assemble and express Plaintiff's views protected by the freedom of association and freedom of speech clauses of the First Amendment, as applied to the states under the Fourteenth Amendment to the United States Constitution.

87.     Defendants' actions violated Plaintiff's rights under the First Amendment to freedom of speech and freedom of assembly by interfering with Plaintiff's ability to associate freely in public and express Plaintiff's views as part of a peaceful demonstration.

88.     Observing and recording public protests, and the police response to those protests, is also a legitimate means of gathering information for public dissemination that is protected by the freedom of speech and freedom of the press clauses of the First Amendment, as applied to the states under the Fourteenth Amendment to the United States Constitution.

89.     Defendants' actions violated Plaintiff's First Amendment rights to freedom of speech and freedom of assembly by interfering with Plaintiff's ability to associate freely in public and express Plaintiff's views as part of a peaceful demonstration.

90.     Defendants engaged in these unlawful actions willfully and knowingly, acting with reckless or deliberate indifference to Plaintiff's First Amendment rights.

91.     As a direct and proximate result of Defendants' unlawful actions described herein, Plaintiff suffered damages including: physical injury, emotional trauma, great concern for Plaintiff's own safety; fear, apprehension, depression, anxiety, consternation and emotional distress;

92.     Additionally, Defendants' actions described herein have had a chilling effect on Plaintiff, who is now less likely to participate in free public discourse.

93.     At all times, Defendants were acting under color of state law.

94.     If Plaintiff prevails, Plaintiff is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

## COUNT II
### 42 U.S.C. § 1983 – Municipal Liability
***Monell* Claim against Defendant City of St. Louis for Failure to Train, Failure to Supervise, and for a Custom of Conducting Unreasonable Search and Seizures and Use of Excessive Force**

95.     Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

96.     Defendant City is liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the remaining Defendants' violations of Plaintiff's rights because the violations were caused by a policy, practice, or custom of the St. Louis Metropolitan Police Department. Among the SLMPD policies, practices, or customs that caused constitutional harm to Plaintiff are the following:

    a.      SLMPD officers' routine use of excessive force when policing protests, especially those at which police brutality is being protested;

    b.      SLMPD's policy or custom of issuing vague and even contradictory dispersal orders without giving an opportunity to comply;

    c.      SLMPD's policy of arbitrarily declaring unlawful assemblies in the absence of any threat or force or violent activity that provides no notice to citizens or unlawful conduct;

    d.      Additionally, SLMPD has a custom, policy, or practice of violating the Fourth Amendment by regularly conducting unreasonable seizures and arresting individuals without probable cause.

97.     Defendant City had notice that its use of force training and officer supervision was inadequate and likely to result in constitutional violations based on multiple incidents of excessive force against protestors in October 2014, November 2014, July 2015, August 2015, and September 2017.

98.     Despite Defendant City's March 2015 *Templeton* settlement agreement, SLMPD officers continue to use non-lethal munitions against non-violent citizens, illustrating Defendant City's deliberate and conscious choice to maintain training and supervision practices that give rise to constitutional violations.

99.     Even after the *Templeton* settlement and the incidents that gave rise to it, Defendant City did not initiate or require comprehensive retraining of its officers, despite repeated, similar constitutional violations perpetrated by SLMPD officers after that settlement and before the incident at issue in this case.

100.    In its failures, Defendant City has been deliberately indifferent to the rights of citizens, and these failures, policies, and customs are the moving force behind, and direct and proximate cause of, the constitutional violations suffered by Plaintiff as alleged herein.

101.    As a direct result of the Defendant City's failures, policies, and customs as described herein, Plaintiff suffered damages, including physical injury, fear, apprehension, and concern for Plaintiff's own safety.

102.    If Plaintiff prevails, Plaintiff is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

### COUNT III
**Missouri State Law – Negligent Infliction of Emotional Distress**
**(Against All Defendants)**

103.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

104.    By assaulting Plaintiff and arresting Plaintiff without probable cause, Defendants realized or should have realized that their conduct posed an unreasonable risk to Plaintiff.

105.    Further, Plaintiff was reasonably in fear for Plaintiff's own person because of the actions of Defendants and suffered emotional distress or mental injury that is medically diagnosable and sufficiently severe to be medically significant as a result of Defendants' actions.

106.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

107.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters."

108.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

109.    The actions of Defendants, as described above, were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

## COUNT IV
### 42 U.S.C. § 1983 – Fourth and Fourteenth Amendment: Excessive Force
### (Against Defendants Vaughan and Wentzel)

110.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

111.    Defendants' use of force against Plaintiff was objectively unreasonable and constituted excessive force.

112.    Defendants engaged in these actions willfully and knowingly, acting with reckless or deliberate indifference to the Plaintiff's Fourth Amendment rights. As a direct and proximate result of Defendants' unlawful actions, Plaintiff was damaged.

113.    As a direct result of the conduct of Defendants described herein, Plaintiff suffered physical injury and emotional trauma.

114.    At all times, Defendants were acting under color of state law.

115.    If Plaintiff prevails, Plaintiff is entitled to recover attorneys' fees, pursuant to 42 U.S.C. § 1988.

**COUNT V**
**42 U.S.C. § 1983 – Fourth and Fourteenth Amendment: Failure to Intervene**
**(Against Defendant Hayden)**

116.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

117.    Defendant Hayden knew or should have known that Defendants Vaughan and Wentzel posed a threat to Plaintiff and other protestors and that Defendants Vaughan and Wentzel would use excessive force.

118.    Defendant Hayden was the supervisor in charge of Defendants Vaughan and Wentzel.

119.     Defendant Hayden knew that Defendants Vaughan and Wentzel posed a threat to Plaintiff and the other protestors, as mere moments before assaulting Plaintiff, Defendant Hayden's officers had assaulted other protestors.

120.    Defendant Hayden was standing within a few feet of Defendants Vaughan and Wentzel, and he could see and hear Defendants Vaughan and Wentzel engaging in threatening and assaultive behavior against Plaintiff.

121.    Defendant Hayden had sufficient time and opportunity to intervene in the time that elapsed between Defendant Vaughan using force on Plaintiff, Defendant Wentzel using force on Plaintiff, and Defendant Wentzel arresting Plaintiff.

122.    Yet, Defendant Hayden did nothing except videotape Defendants Vaughan and Wentzel using excessive force against Plaintiff.

123.    Defendant Hayden had a duty to intervene and prevent Defendants Vaughan and Wentzel from violating the constitutional rights of Plaintiff and the other protestors.

124.    Defendant Hayden failed to intervene and allowed Defendants Vaughan and Wentzel to use excessive force on Plaintiff, in violation of Plaintiff's constitutional rights.

125.    Defendant Hayden directed, approved of, or tacitly authorized the excessive force used by Defendants Vaughan and Wentzel by watching and recording their conduct from about five feet away and failing to stop Defendants Vaughan and Wentzel, protect Plaintiff, or reprimand Defendants Vaughan and Wentzel.

126.    Defendant Hayden engaged in these actions willfully and knowingly, acting with reckless or deliberate indifference to the Plaintiff's Fourth Amendment rights. As a direct and proximate result of Defendants Hayden's failure to intervene, Plaintiff was damaged.

127.    As a direct result of the conduct of Defendant Hayden described herein, Plaintiff suffered physical injury and emotional trauma.

128.    At all times, Defendant Hayden was acting under color of state law.

129.    If Plaintiff prevails, Plaintiff is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

## COUNT VI
### Missouri State Law – Battery
### (Against All Defendants)

130.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

131.    During the process of being unconstitutionally beaten, pepper sprayed, and arrested, Plaintiff suffered battery at the hands of Defendants.

132.    In beating and pepper spraying Plaintiff, Defendants caused further intentional and offensive bodily contact.

133.    Namely, Defendants' physically aggressive tactics caused intentional and offensive bodily harm to Plaintiff.

134.    As a direct result of Defendant's conduct described herein, Plaintiff suffered damages, including physical injury, emotional trauma, great concern for Plaintiff's own safety; fear, apprehension, depression, anxiety, consternation and emotional distress.

135.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

136.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters."

137.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

138.    The actions of Defendants, as described above, were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

## COUNT VII
### 42 U.S.C. § 1983 – Fourth and Fourteenth Amendment Violations: Unreasonable Seizure
### (Against Defendants Vaughan and Wentzel)

139.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

140.    Defendants did not have probable cause to arrest Plaintiff.

141.    Defendants unreasonably seized Plaintiff, thereby depriving Plaintiff of Plaintiff's right to be free from unreasonable seizure of Plaintiff's person in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

142.    Further, there was no objectively reasonable belief that Plaintiff had committed a criminal offense, nor was there even arguable probable cause for the arrest. As such, the seizure was unreasonable.

143.    Defendants engaged in these unlawful actions willfully and knowingly, acting with reckless or deliberate indifference to Plaintiff's Fourth Amendment rights. As a direct and proximate result of Defendants' unlawful actions, Plaintiff was damaged.

144.    At all times, Defendants were acting under color of state law.

145.    If Plaintiff prevails, Plaintiff is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

## COUNT VIII
### Missouri State Law – False Arrest
### (Against All Defendants)

146.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

147.    Plaintiff was arrested without any legal justification or probable cause by Defendant Wentzel.

148.     Defendants proceeded to constrain and confine Plaintiff against Plaintiff's free will. There was no lawful justification for Defendants restraining and confining Plaintiff in the above manner.

149.     As a direct result of the conduct of Defendants described herein, Plaintiff suffered damages, including physical injury, fear, apprehension, and emotional trauma.

150.     Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

151.     Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters."

152.     By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

153.     The actions of Defendants, as described above, were carried out in bad faith and with malice, such that punitive damages should be awarded to punish Defendants and to deter them, as well as others similarly-situated individuals from engaging in similar conduct in the future, in an amount to be determined by a jury.

**COUNT IX**
**Missouri State Law – False Imprisonment**
**(Against All Defendants)**

154.     Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

155.    Defendants intentionally restrained and confined Plaintiff against Plaintiff's will when they took Plaintiff into custody and detained Plaintiff.

156.    Plaintiff did not consent to Defendants' actions in removing and confining Plaintiff in the manner described above, nor in any manner whatsoever.

157.    There was no lawful justification for Defendants to restrain and confine Plaintiff in the manner described above.

158.    Defendants held Plaintiff in confinement for a substantial period of time, spanning several hours.

159.    As a direct and proximate result of Plaintiff's false imprisonment by Defendants, Plaintiff suffered damages, including physical injury, emotional trauma, great concern for Plaintiff's own safety; fear, apprehension, depression, anxiety, consternation and emotional distress.

160.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

161.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters."

162.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

28

163.    Defendants' actions, as described above, were carried out with an evil motive and/or reckless indifference and conscious disregard for Plaintiff's rights, thereby entitling Plaintiff to punitive damages in an amount sufficient to punish and deter Defendants and others similarly situated from like conduct in the future.

**COUNT X**
**Missouri State Law – Abuse of Process**
**(Against All Defendants)**

164.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

165.    Defendants made an illegal, improper, and perverse use of process by arresting, charging, and detaining Plaintiff without any legal justification or probable cause in order to harass and intimidate Plaintiff, which constitutes an improper collateral purpose.

166.    Defendants acted willfully and knowingly when they abused legal process for unlawful purposes and with an illegitimate collateral objective, in that Defendants used legal process through their authority for purposes other than the legitimate investigation and prosecution of criminal acts.

167.    As a direct and proximate result of Defendants' abuse of process, Plaintiff suffered damages including: emotional trauma, great concern for Plaintiff's own safety; fear, apprehension, depression, anxiety, consternation and emotional distress; lost time; loss of employment opportunity; and loss of faith in society.

168.    Defendants' actions, as described above, were carried out with an evil motive and/or reckless indifference and conscious disregard for Plaintiff's rights, thereby entitling Plaintiff to punitive damages in an amount sufficient to punish and deter Defendants and others similarly situated from like conduct in the future.

## COUNT XI
### Missouri State Law – Malicious Prosecution
### (Against All Defendants)

169.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

170.    Defendants assisted in the filing of charges against Plaintiff with no probable cause that Plaintiff had committed a crime or ordinance violation.

171.    Such charges were subsequently dismissed against Plaintiff. As a direct result of the conduct of Defendants described herein, Plaintiff suffered damages, including physical injury, emotional trauma, great concern for Plaintiff's own safety; fear, apprehension, depression, anxiety, consternation and emotional distress; lost time; loss of employment opportunity; and loss of faith in society.

172.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

173.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters."

174.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

175.    The actions of Defendants, as described above, were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should

be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

**WHEREFORE**, Plaintiff prays for judgment in favor of Plaintiff, against all Defendants, for compensatory damages, punitive damages, attorneys' fees, expenses, costs, and for any other relief this Court deems just and appropriate.

Date: September 10, 2019                 Respectfully Submitted,

                                                  **KHAZAELI WYRSCH LLC**

                                                  /s/ Kiara N. Drake
                                                  James R. Wyrsch, 53197MO
                                                  Javad M. Khazaeli, 53735MO
                                                  Kiara N. Drake, 67129MO
                                                  911 Washington Avenue, Suite 211
                                                  St. Louis, MO 63101
                                                  (314) 288-0777
                                                  (314) 400-7701 (fax)
                                                  james.wyrsch@kwlawstl.com
                                                  javad.khazaeli@kwlawstl.com
                                                  kiara.drake@kwlawstl.com