**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| DARRYL GRAY, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Case No. 4:18-cv-01678-SEP |
| | ) |
| CITY OF ST. LOUIS, et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

Before the Court is Defendant City of St. Louis's Motion for Summary Judgment, Doc. [109]. For the reasons set forth below, the motion is granted.

### FACTS AND BACKGROUND

Plaintiff Rev. Darryl Gray claims that two St. Louis Metropolitan Police Department (SLMPD) officers—Detectives Ronald Vaughan and Larry Wentzel—pepper sprayed, pushed, body slammed, and arrested him while he was peacefully protesting in downtown St. Louis on September 29, 2017. In a separate Order, the Court denied Detectives Vaughan and Wentzel's Motion for Summary Judgment, Doc. [111], because genuine disputes of material fact precluded a finding that no reasonable jury could find in favor of Rev. Gray. *See* Doc. [158].

In addition to the claims against Detectives Vaughan and Wentzel, Rev. Gray alleges that the City of St. Louis is liable under 42 U.S.C. § 1983 for maintaining a custom of violating constitutional rights. He claims the City's custom was "the moving force behind, and direct and proximate cause of, the constitutional violations suffered by [Rev. Gray]." Doc. [45] ¶ 100. Rev. Gray also brings state law claims against the City for negligent infliction of emotional distress (Count III), battery (Count VI), false arrest (Count VIII), false imprisonment (Count IX), abuse of process (Count X), and malicious prosecution (Count IX). The City moves for summary judgment on all claims, claiming sovereign immunity from the state law claims and arguing that Rev. Gray cannot satisfy the standard for municipal liability under § 1983.

### LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court must grant summary judgment if it finds, based on the factual record, that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986). Material facts are those that "might affect the outcome of the suit under the governing law," and there is a genuine dispute where "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323 (quotation marks omitted). The burden then shifts to the non-movant to "present specific evidence, beyond 'mere denials or allegations [that] . . . raise a genuine issue for trial.'" *Farver v. McCarthy*, 931 F.3d 808, 811 (8th Cir. 2019) (alteration in original) (quoting *Wingate v. Gage Cnty. Sch. Dist.*, 528 F.3d 1074, 1079 (8th Cir. 2008)). "A party asserting that a fact . . . is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot product admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]" Fed. R. Civ. P. 56(e)(2).

## DISCUSSION

## I.   The City has sovereign immunity from the state law claims.

The City argues that it has sovereign immunity from Rev. Gray's state law claims.[1] *See* Doc. [113] at 12-15. Rev. Gray does not address the City's sovereign immunity argument in his response, *see* Doc. [131-62], but in the Second Amended Complaint, Rev. Gray does allege that the existence of the Public Facilities Protection Corporation waives the City's sovereign immunity on state claims by operation of Mo. Rev. Stat. § 537.610.1. Doc. [45] ¶¶ 106-08.

This Court recently granted summary judgment to the City on state law tort claims in *Brandy v. City of St. Louis*, 2023 WL 6215815, at *2 (E.D. Mo. Sept. 25, 2023), for reasons that apply with equal force here. As a federal court applying a Missouri state statute, the Court treats the holding of the Missouri Court of Appeals in *Hendrix v. City of St. Louis*, 636 S.W.3d 889,

---

[1] The term "sovereign immunity" in this context refers to a "statutorily provided immunity," not the "immunity inherent to sovereigns that we usually discuss in the Eleventh Amendment context." *Torres v. City of St. Louis*, 39 F.4th 494, 508 n.9 (8th Cir. 2022) (quoting *Davis v. Buchanan Cnty.*, 5 F.4th 907, 909 n.1 (8th Cir. 2021)).

900 (Mo. Ct. App. 2021), as "the best evidence of state law" as to whether the City has waived sovereign immunity by adopting a self-insurance plan.  *Baxter Int'l, Inc. v. Morris*, 976 F.2d 1189, 1196 (8th Cir. 1992); *see also Langford v. City of St. Louis*, 3 F.4th 1054, 1059 (8th Cir. 2021) (state appeals court decision "is the best indication available of Missouri law").  The Eighth Circuit has relied on *Hendrix* in analyzing the same issue.  *See Torres v. City of St. Louis*, 39 F.4th 494, 510 (8th Cir. 2022).

"The plaintiff shoulders the burden of proving the existence of an insurance policy and that the terms of the policy cover the plaintiff's claim."  *Hendrix*, 636 S.W.3d at 900 (quoting *A.F. v. Hazelwood Sch. Dist.*, 491 S.W.3d 628, 635 (Mo. Ct. App. 2016)).  In order to defeat the City's invocation of sovereign immunity on summary judgment, Rev. Gray must at least demonstrate that there is a genuine dispute of material fact as to whether the City is self-insured.  *See, e.g.*, *Torres*, 39 F.4th at 509.  The plaintiffs in *Brandy*, *Hendrix*, and *Torres* failed to meet that burden with respect to the PFPC, and Rev. Gray fares no better.  *Torres*, 39 F.4th at 509 (plaintiffs produced no evidence of "an insurance policy or ordinance that purports to adopt a plan of self-insurance providing coverage for [their] claims"); *Hendrix*, 636 S.W.3d at 901 (plaintiff did not provide "any evidence . . . showing that the City does have insurance covering her specific claim").  Because Rev. Gray has not demonstrated that there is a genuine dispute of material fact as to whether the City is self-insured, the City is entitled to summary judgment on the state law claims.

## II.     The City is entitled to summary judgment as to Rev. Gray's *Monell* claim.

The City claims it deserves summary judgment on Count II on two grounds:  (1) because there was no underlying constitutional violation, and (2) because Rev. Gray cannot establish the elements of a *Monell* claim.  The first argument fails for the reasons set forth in the Court's Memorandum and Order denying Defendants Vaughan and Wentzel's Motion for Summary Judgment, Doc. [158].  But on careful inspection of the record, the Court agrees with the City that Rev. Gray has not produced sufficient evidence to enable a reasonable jury to find the elements of a *Monell* claim.

"It is well established that a municipality cannot be liable under § 1983 under 'a respondeat superior theory, that is, solely because it employs a tortfeasor.'"  *Robbins v. City of Des Moines*, 984 F.3d 673, 681 (8th Cir. 2021) (quoting *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1214 (8th Cir. 2013)).  "[U]nder § 1983, local governments are responsible only for

'their *own* illegal acts.'" *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)).  Therefore, a "municipality may only be liable for a constitutional violation resulting from (1) an official municipal policy, (2) an unofficial custom, or (3) failure to train or supervise." *Robbins*, 984 F.3d at 681-82.  In Count II of the Second Amended Complaint, Rev. Gray alleges that the City is liable under the second and third theories of *Monell* liability.  Doc. [45] ¶¶ 95-102.  While Rev. Gray uses the word "policy," he does not allege that the City has an official policy of violating the constitutional rights of protestors.  But Rev. Gray does accuse the City of maintaining several unconstitutional unofficial customs:

> a.   SLMPD officers' routine use of excessive force when policing protests, especially those at which police brutality is being protested;
>
> b.   SLMPD's policy or custom of issuing vague and even contradictory dispersal orders without giving an opportunity to comply;
>
> c.   SLMPD's policy of arbitrarily declaring unlawful assemblies in the absence of any threat or force or violent activity that provides no notice to citizens or unlawful conduct;
>
> d.   Additionally, SLMPD has a custom, policy, or practice of violating the Fourth Amendment by regularly conducting unreasonable seizures and arresting individuals without probable cause.

*Id*. ¶ 96.  And Rev. Gray alleges that "Defendant City had notice that its use of force training and officer supervision was inadequate and likely to result in constitutional violations based on multiple incidents of excessive force against protestors in October 2014, November 2014, July 2015, August 2015, and September 2017."  *Id*. ¶ 97.

Two of the four customs alleged in the Second Amended Complaint are nonstarters for the purposes of this lawsuit.  The facts of this case do not include a dispersal order or declaration of an unlawful assembly.  If the City does have a custom of improperly issuing dispersal orders or declaring unlawful assemblies, Doc. [45] ¶ 96, neither one could have been the "moving force" behind Rev. Gray's alleged constitutional injuries.  Summary judgment is therefore granted as to those two alleged customs.  *See Laney v. City of St. Louis*, 2021 WL 4439252, at *7 (E.D. Mo. Sept. 28, 2021).

That leaves two alleged customs that might support municipal liability for Rev. Gray's alleged harms:  (1) a custom of "routine use of excessive force when policing protests," and (2) a custom of "regularly conducting unreasonable seizures and arresting individuals without probable cause."  Doc. [45] ¶ 96.  Rev. Gray's allegation that the City failed to train and

supervise SLMPD officers could also provide a basis for *Monell* liability. *Id.* ¶ 97. The Court will address each possible basis for *Monell* liability in turn.

### A. Rev. Gray's custom claim fails.

To succeed under *Monell* on the basis of a municipal custom, Rev. Gray must prove:

> (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
>
> (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
>
> (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Hall v. Higgins*, 77 F.4th 1171, 1180 (8th Cir. 2023) (quoting *Brewington v. Keener*, 902 F.3d 796, 801 (8th Cir. 2018)).

The first step toward surviving summary judgment, then, is for Rev. Gray to show that he has made a submissible case for "the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees." *Id.* Unfortunately, Rev. Gray has erected a number of obstacles to the Court's evaluation of that question.

First, in his response to the City's Motion for Summary Judgment, Rev. Gray makes a case in support of a different set of customs than he alleged in the Second Amended Complaint. *See* Doc. [131-62] at 1-2.[2] While the Court "recognize[s] that the pleading requirements under the Federal Rules are relatively permissive, they do not entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment." *N. States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1057 (8th Cir. 2004); *see also*

---

[2] In his Response, Rev. Gray "submits the following *Monell* customs and practices":

1) A custom of failing to train or discipline officers regarding of [sic] retaliatory use of chemical munitions against protesters.

2) A custom of failing to train or discipline officers regarding of [sic] retaliatory actions against those exercising First Amendment rights more generally;

3) A custom of failing to train or discipline officers regarding excessive force against citizens in St. Louis;

4) A custom of failing to train or discipline the Narcotics team, of which Defendants Vaughan and Wentzel were members.

Doc. [131-62] at 1-2.

*Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1006 (8th Cir. 2012) (refusing to consider new claims not alleged in a complaint); *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009) (a plaintiff cannot "expand his claims in his brief").  The Court is thus bound to consider whether Rev. Gray has made a sufficient case in support of his custom claims as alleged in the Second Amended Complaint, not as reformulated in his summary judgment briefing.  Unfortunately, Rev. Gray elected not to provide the Court with an argument that directly addresses that question.

Examining the evidentiary record without the benefit of such guidance, the Court finds that it is cluttered with evidence that is improper, irrelevant, or otherwise insufficient.  For example, in two of the cases Rev. Gray cites as evidence of a pattern of police misconduct, courts found that there had been no misconduct.  *See Whitt v. City of St. Louis*, 2021 WL 2805286, at *7 (E.D. Mo. July 6, 2021) (finding that the officers had probable cause to arrest Mr. Whitt for interfering with their official duties at the crime scene); *Green v. City of St Louis*, 2023 WL 2374175, at *5 (E.D. Mo. Mar. 6, 2023) (finding that Officer Tanner "had probable cause to believe that plaintiff posed an immediate threat of death or serious bodily injury, and his use of force was therefore reasonable").  Such cases obviously do not lend support to a putative custom of police misconduct.

Rev. Gray also cites settlements as evidence of police misconduct.  As this Court has explained elsewhere, a plaintiff "cannot use prior settlements to prove that the City was liable for the claims of [police misconduct] that were dismissed as a result of those settlements." *Naes v. City of St. Louis*, 2021 WL 6049815, at *6 (E.D. Mo. Dec. 21, 2021).  The cases brought by Scott O'Rourke, Mario Crump, and Kevin Chestnut were all settled with no admission of wrongdoing by the defendants.  To the extent that Rev. Gray relies on settlements themselves, as opposed to affidavits or witness testimony—*see, e.g.*, Doc. [140-1] at 39 ¶ 50—that evidence is impermissible for establishing a custom. *See Naes*, 2021 WL 6049815, at *7 ("Plaintiff's reliance on settlement agreements to substantiate a putative custom of improper protection is impermissible under Rule 408.").

Scott O'Rourke's case also suffers from another defect, which afflicts Calvin Fletcher's lawsuit, *Fletcher v. Tomlinson*, No. 4:14-cv-00999 (E.D. Mo. May 29, 2014), and Zach Chasnoff's declaration, Doc. [131-23] at 4-5, as well:  The alleged misconduct occurred before

the City of St. Louis took control of SLMPD in September 2013.[3]  *See Green v. Missouri*, 734 F. Supp. 2d 814, 846 (E.D. Mo. 2010).  Rev. Gray does not explain how the City can be held responsible for misconduct by SLMPD officers that took place before the City had control of SLMPD.

And then some of Rev. Gray's evidence, although not categorically impermissible, provides little support for either of the customs he alleges.  For example, the text messages from DOJ show officers talking about using force, but nothing in those texts enables the Court to identify, characterize, or quantify instances of the use of excessive force in policing a protest or of unreasonable seizure or arrest without probable cause.[4]  *See* Doc. [131-27].  Thus, the texts provide no actual evidence to support either of the customs alleged by Rev. Gray.[5]  And many of the declarations Rev. Gray has submitted are too cursory or conclusory to provide any support for his custom claim.  *See, e.g.*, Doc. [131-29] at 17 ¶ 3 ("That evening, St. Louis Metropolitan police officers deployed chemical agents and rubber bullets against me and others without giving us adequate time or routes to disperse or telling us where we needed to go.").

The Eighth Circuit has explained that the "mere existence of previous citizens' complaints does not suffice to show a municipal custom of permitting or encouraging excessive force."  *Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999) (citing *Rogers v. City of Little Rock*, 152 F.3d 790, 799 (8th Cir. 1998)).  The evidence of such complaints has to be "sufficient to demonstrate that the municipalities and their officials ignored police misconduct."  *Id*.  Thus, in *Mettler*, the Eighth Circuit rejected the plaintiff's evidence of other complaints where she had "produced no evidence regarding the factual background of these previous complaints, nor . . . shown that the incidents giving rise to these complaints bear any factual similarity to the . . . confrontation with her son."  *Id*.  Likewise, here, Rev. Gray's custom claim cannot rest on complaints of other incidents that do not contain enough detail to allow for evaluation of their similarity to his allegations.  *See also Jones v. City of St. Louis*, 599 F. Supp. 3d 806, 824 (E.D.

---

[3] Press Release, *Signing of Executive Order No. 48 ends 152 Years of State Rule*, City of St. Louis (Sept. 1, 2013), https://www.stlouis-mo.gov/archives/newsgram/city-regains-control-of-metropolitan-police-dept.cfm.

[4] Rev. Gray alleges a connection between some texts and "the Stockley protest," but no text reports a use of excessive force; they all express enthusiasm or intent.  *See* Doc. [140-1] at 37 ¶ 40.

[5] The texts also contain no indication that any of the officers understood excessive force to be acceptable in the SLMPD, or that they would not expect to be disciplined for such conduct.

Mo. 2022) (insufficiently detailed allegations, "while concerning, only briefly address the 2015 and 2017 incidents and do not provide the details necessary to evaluate their similarity to the current one").[6]

Turning, then, to that subset of Rev. Gray's evidence that does not suffer from any disqualifying defect, the Court finds that the bulk of it evinces misconduct that differs significantly from that which Rev. Gray himself alleges. *See, e.g.*, Doc. [147-47] (detailing Kurtis Newlon's allegation of excessive force, involving neither a protest nor use of a chemical agent). Most notably, Rev. Gray cites numerous instances of alleged misconduct directed at assembled groups of protestors, including the use of chemical munitions to disperse such groups. *See, e.g.*, Doc. [131-23] at 6-7 (group of protestors tear gassed "just east of the intersection of Arsenal Street and Grand Avenue" in October 2014), *id.* (group of protestors tear gassed at the intersection of Vandeventer and Manchester/Chouteau Avenues in October 2014), 8-9 (group of protestors blocking a highway off-ramp pepper sprayed and arrested in November of 2014), 15 (group of protestors pepper sprayed in the Holly Hills neighborhood in May 2015); 16 (group of protestors pepper sprayed at the intersection of Grand and Arsenal in October 2014), 19-20 (group of protestors tear gassed at the intersection of Grand and Arsenal in November 2014), 22-23 (group of protestors pepper sprayed at the intersection of Clark Avenue and Tucker Boulevard on September 15, 2017), 28-29 (group of protestors tear gassed near the Central Reform

---

[6] Rev. Gray's submission of numerous declarations reciting conclusory allegations in precisely the same legally loaded terms provides an egregious example of this deficiency. *See, e.g.*, Doc. [131-23] at 1-2 ("On November 30, 2014, I saw St. Louis Metropolitan Police Department officers threaten to use pepper spray *against a person they perceived to be expressing an anti-law enforcement view in order to retaliate against him for that perceived view and chill him from publicly expressing it*."), 4 ("I saw St. Louis Metropolitan Police Department officers deploy tear gas *against people they perceived to be expressing an anti-law enforcement view in order to retaliate against them for that perceived view and chill them from publicly expressing it*, including myself."), 6-7 ("On both occasions, I saw St. Louis Metropolitan Police Department officers deploy tear gas *against people they perceived to be expressing an anti-law enforcement view in order to retaliate against them for that perceived view and chill them from publicly expressing it*, including myself."), 10 ("On December 31, 2014, I saw St. Louis Metropolitan Police Department officers deploy pepper spray *against people they perceived to be expressing an anti-law enforcement view in order to retaliate against them for that perceived view and chill them from publicly expressing it*."), 11 ("On December 1, 2014, I saw St. Louis Metropolitan Police Department officers threaten to deploy pepper spray *against a person they perceived to be expressing an anti-law enforcement view in order to retaliate against him for that perceived view and chill him from publicly expressing it*."), 12 ("On December 31, 2014, I saw St. Louis Metropolitan Police Department officers deploy pepper spray *against people they perceived to be expressing an anti-law enforcement view in order to retaliate against them for that perceived view and chill them from publicly expressing it*.") (emphases added). Counsel would do well to bear in mind that quantity is no substitute for quality.

Congregation synagogue on September 15, 2017); Doc. [131-32] at 3-4 (group of protestors tear gassed at the intersection of Lake Avenue and Westminster on September 15, 2017), 7-9 (group of protestors tear gassed near the Central Reform Congregation synagogue on September 15, 2017), 7-9 (group of protestors tear gassed near Chase Park Plaza on September 15, 2017), 10-13 (group of protestors tear gassed and pepper sprayed outside "Pi Pizzeria, at the northeast corner of McPherson and Euclid Avenues" on September 15, 2017); Doc. [131-59] at 2-4 (group of protestors tear gassed in three different areas of the Fountain Park neighborhood on August 19, 2015), 5-7 (group of protestors pepper sprayed at the workhouse on Hall Street in July 2017); *see also* Docs. [131-23] at 30-35, [131-29] (declarations related to "kettling" incident on September 17, 2017).  The conduct alleged by each of the witnesses is troubling, certainly, and every incident may qualify as a use of excessive force or improper arrest.  But the question for this Court is whether those incidents are similar enough to the misconduct alleged by Rev. Gray to be considered part of the same pattern, such that a reasonable jury could rely on it in finding the City liable for Rev. Gray's injuries under *Monell*.

When considering whether a pattern of misconduct could give rise to *Monell* liability, a court considers only misconduct that is sufficiently similar to that alleged by the plaintiff to have provided notice to the municipality of the risk of plaintiff's alleged injury.  *See, e.g.*, *Connick*, 563 U.S. at 62 (other kinds of *Brady* violations "could not have put [the prosecutor] on notice that the office's *Brady* training was inadequate"); *McGuire v. Cooper*, 952 F.3d 918, 922-23 (8th Cir. 2020) ("fifteen prior incidents of sexual misconduct" were not "similar in kind or sufficiently egregious in nature to demonstrate a pattern of sexual assault against members of the public by deputies").  "In order to establish a pattern," the Eighth Circuit has written, "our case law requires a showing of more than general allegations . . . .  It requires the other misconduct to 'be *very similar to the conduct giving rise to liability*.'"  *McGuire*, 952 F.3d at 923 (emphasis added) (quoting *Livers v. Schenck*, 700 F.3d 340, 356 (8th Cir. 2012)).  Without that constraint, a plaintiff could manufacture a *Monell* claim just by defining the putative custom at a high enough level of generality.

Applying that principle to this case, the Court finds that many of the incidents cited by Rev. Gray are not part of the same pattern as his claim.  In particular, the cited instances of misuse of chemical munitions to disperse groups of assembled protestors would not have given the City notice that an individual officer might pepper spray or arrest an individual protestor

under the circumstances alleged by Rev. Gray.  Just as there are different kinds of *Brady* violations and different kinds of sexual misconduct, there are different kinds of First and Fourth Amendment violations, even against protestors.  If a plaintiff could define a custom as generally as Rev. Gray does—"use of excessive force when policing protests"—then a municipality could be held liable for one-off, *sui generis* misconduct of which it had no notice at all, so long as it fit that broad description.

Without the evidence relating to crowd dispersals, the body of evidence supporting Rev. Gray's custom claim is:  (1) Keith Rose's claim that he was tear gassed in October 2014 when acting as a legal observer at a peaceful protest, Doc. [131-23] at 16; (2) the May 2015 tasing of Kristine Hendrix, Doc. [140-1] at 35 ¶¶ 32-33; (3) the May 2015 complaint against Detective Wentzel for deploying mace against an unarmed protestor, Doc. [131-40]; (4) the declarations alleging that police sprayed and/or arrested individual peaceful protestors on September 15 and 17, 2017, Docs. [131-23] at 22, 26; [131-29] at 14, 23; and (5) the assault of Luther Hall on September 17, 2017, Doc. [140-1] at 37 ¶¶ 41-42.

Some of the remaining evidence suffers from significant weaknesses.  For example, Keith Rose's testimony regarding the October 2014 incident lacks detail, and the information it does provide differs in important respects from what Rev. Gray alleges.  *See* Doc. [131-23] at 16.  The single-sentence description in the May 2015 complaint against Detective Wentzel likewise provides barely enough information to allow an assessment of its similarity to this case, and it lacks critical information, like precisely how the protestor was being "uncooperative."  Doc. [131-40].  And the tasing of Kristine Hendrix in May 2015 provides only equivocal support to Rev. Gray's *Monell* claim, because the SLMPD investigated and disciplined the offending officer for that incident.  *See* Doc. [131-26].[7]  Thus, while it provides a data point supporting a pattern of misconduct, it also weakens the case for "deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials," which a plaintiff also has to prove to prevail on a *Monell* custom claim.  *Hall*, 77 F.4th at 1180.

Ignoring those weaknesses and viewing the evidence of sufficiently similar incidents in the light most favorable to Rev. Gray, the Court finds it insufficient to support a *Monell* custom claim.  A handful of occasions of similar misconduct over several years—most of them within

---

[7] Rev. Gray alleges that the Internal Affairs Department initially exonerated Officer Ogunjobi, but he ignores the fact that the Chief of Police ultimately rejected that finding and ordered a written reprimand and reinstruction on the use of force.  *See* Doc. [131-26] at 1.

two days of each other—is not enough for a reasonable jury to find a "continuing, widespread, persistent pattern of unconstitutional misconduct." *Hall*, 77 F.4th at 1180 (quoting *Brewington*, 902 F.3d at 801); *see also Jones*, 599 F. Supp. 3d at 824 (finding insufficient evidence of a custom of excessive force against protestors in case arising from *Stockley* protests); *Burbridge v. City of St. Louis*, 430 F. Supp. 3d 595, 620 (E.D. Mo. 2019) (same).

The burden of proving a custom is a heavy one.  Rev. Gray must provide enough evidence for a reasonable jury to find a "pattern of unconstitutional conduct . . . so pervasive and widespread . . . 'as to have the effect and force of law.'" *Brewington*, 902 F.3d at 801 (quoting *Andrews v. Fowler*, 98 F.3d 1069, 1075 (8th Cir. 1996)).  Because Rev. Gray has not done so, the City is entitled to summary judgment as to his custom claim.

### B.      Rev. Gray's failure-to-train claim fails.

To establish a *Monell* violation on a failure-to-train theory, Rev. Gray must show that "(1) [the City's] officer-training practices were inadequate; (2) [the City] was deliberately indifferent to the rights of others in adopting these training practices, and [the City's] failure to train was a result of deliberate and conscious choices it made; and (3) [the City's] alleged training deficiencies caused [Rev. Gray's] constitutional deprivation." *Ulrich v. Pope Cnty*, 715 F.3d 1054, 1061 (8th Cir. 2013).  "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61.  On a failure-to-train theory, a "pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference . . . ." *Id*. at 62 (quoting *Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 409 (1997)).

Because Rev. Gray has failed to demonstrate a pattern of similar constitutional violations, he must rely on the "single-incident" theory of liability posited in *Canton v. Harris*, 489 U.S. 378 (1989).  In *Canton*, the Supreme Court "left open the possibility that, 'in a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference." *Connick*, 563 U.S. at 63.  "The Court sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id*. at 64.

Rev. Gray's allegations do not state a plausible claim on that theory either.  According to Rev. Gray, he was exercising his First Amendment right to peacefully protest when he was

11

pushed, pepper sprayed, and arrested "without provocation or justification."  Doc. [140-1] at 18 ¶ 77, 20 ¶ 80, 21 ¶ 82.  Assuming Rev. Gray's allegations are true, it would have been obvious to Defendants Vaughan and Wentzel that their conduct was impermissible without any specialized training.  It was not a situation in which "the need for further training must have been plainly obvious to the city policymakers."  *Canton*, 489 U.S. at 390 n.10.

In *Andrews v. Fowler*, the Eighth Circuit considered whether a City could be liable for a rape committed by one of its police officers.  98 F.3d 1069 (8th Cir. 1996).  The Court of Appeals explained that "[i]n light of the regular law enforcement duties of a police officer, we cannot conclude that there was a patently obvious need for the city to specifically train officers not to rape young women."  *Id*. at 1077.  While the conduct in *Andrews* was more egregious than that alleged in this case, the same principle applies:  A city is not liable for a failure to train its officers to refrain from engaging in manifestly unlawful acts.  The more obvious the wrong, the less obvious the need to train officers not to do it.  *See, e.g.*, *Christmas v. Harris Cnty., Ga.*, 51 F.4th 1348, 1357 (11th Cir. 2022); *Gambrel v. Knox Cnty.*, 25 F.4th 391, 410 (6th Cir. 2022); *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1288 (10th Cir. 2019).  That is why it is essential for a city to train officers about when the use of deadly force is appropriate to stop a fleeing felon, but it is not necessary for a city to train its officers not to commit sexual assaults. *Compare Connick*, 563 U.S. at 64 ("Armed police must sometimes make split-second decisions with life-or-death consequences.  There is no reason to assume that police academy applicants are familiar with the constitutional constraints on the use of deadly force.  And, in the absence of training, there is no way for novice officers to obtain the legal knowledge they require.  Under those circumstances there is an obvious need for some form of training."), *with McGuire*, 952 F.3d at 923 ("[T]here is no patently obvious need to train officers not to sexually assault women . . . .") (quoting *Andrews*, 98 F.3d at 1078)).

That principle also differentiates this case from suits against the City of St. Louis that involved the use of chemical munitions to disperse large groups of protestors or in the context of an unlawful assembly.  In the context of a large group of protestors or an unlawful assembly, police may face difficult judgment calls, such as when to resort to chemical munitions, who counts as part of an unlawful assembly, and when a dispersal is necessary or complete.  Faced with such decisions, especially in heightened contexts requiring immediate action, training is likely to make a difference to an officer's ability to discern right action from wrong action.  But

12

Detectives Vaughan and Wentzel faced no such dilemmas on the day they encountered Rev. Gray.  Viewing the disputed facts in the light most favorable to Rev. Gray, the question Detectives Vaughan and Wentzel faced was more straightforward:  Is it permissible to push, pepper spray, take down, and arrest a peaceful protestor who has done nothing except respectfully speak his mind?  The answer to that question is obvious.  Therefore, it would not have been obvious to the City that it needed to train its officers not to engage in such conduct.[8]

The fact that Detectives Vaughan and Wentzel allegedly engaged in such obvious wrongdoing is also relevant to the question of causation.  *See Gambrel*, 25 F.4th at 410 ("A large body of precedent supports our conclusion.  The deliberate-indifference and causation elements regularly foreclose failure-to-train claims against municipalities when rogue employees engage in blatant wrongdoing (say, a sexual assault of an inmate or a gratuitous beating of a detainee).").  In order to prevail on a failure-to-train claim, Rev. Gray must show that "'the identified deficiency in [the] [C]ity's training program [is] closely related to the ultimate injury' such that 'the deficiency in training actually caused the police officers'' offending conduct."  *Andrews*, 98 F.3d at 1077 (citing *Canton*, 489 U.S. at 391).  Because it should have been obvious to Defendants Vaughan and Wentzel that their conduct was not permitted, Rev. Gray "simply cannot demonstrate the close relationship necessary to conclude that the [C]ity's failure to properly train [Detectives Vaughan and Wentzel] *caused* [them to push, pepper spray, and arrest a peaceful protest such as Rev. Gray]."  *Id*.

Moreover, Vaughan and Wentzel admitted that just before the incident started, Vaughan said, "We are tired of this s**t."  Doc. [138] at 15 ¶ 13.  Taking Rev. Gray's version of the facts as true, that fact suggests that the immediate cause of Vaughan's conduct, anyway, was personal animus, not deficient training.  *See Brewington*, 902 F.3d at 802 ("Deputy Keener was asked in his deposition, 'Sitting here today, do you know why you kicked Josh?'  He answered, 'Other than just being angry, no.'  Keener's anger—not any county policy or directive—was the moving force for his conduct.") (citations omitted); *see also Connick*, 563 U.S. at 78 (Scalia, J., concurring) (attributing a *Brady* violation to the "bad-faith, knowing violation" of the prosecutor, not "lack of training.").  Applying the "rigorous standards of culpability and causation," there is

---

[8] *See Gambrel*, 25 F.4th at 410 ("'Even an untrained' officer—let alone one trained at the academy— would know that wanton violence 'was inappropriate.'" (quoting *Waller*, 932 F.3d at 1288)); *Waller*, 932 F.3d at 1288 ("[The officer's] use of force was improper not because of the amount of force he used, but because no force was warranted in the first place.").

insufficient evidence for a reasonable jury to find that deficient training caused Rev. Gray's injuries. *Bryan Cnty.*, 520 U.S. at 405.  Accordingly, the City is entitled to summary judgment as to Rev. Gray's failure-to-train claim.[9]

CONCLUSION

*Monell* makes clear that a City can be held liable only "for injuries inflicted pursuant to Government 'policy or custom.'"  *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 809 (1985). "[T]hat requirement was intended to prevent the imposition of municipal liability under circumstances where no wrong could be ascribed to municipal decisionmakers."  *Id.*  To avoid a relapse into *respondeat superior* liability, Supreme Court precedent demands that Rev. Gray point to competent evidence of a continuing, widespread, and persistent pattern of sufficiently similar events.  Rev. Gray failed to present enough evidence for a reasonable jury to make that finding.  He likewise failed to make a submissible case for *Monell* liability for failure to train or supervise.  Therefore, the City is entitled to summary judgment on Count II.  And because there is no evidence that the City waived sovereign immunity, the City is also entitled to summary judgment on Rev. Gray's state law claims.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant City of St. Louis's Motion for Summary Judgment, Doc. [109], is **GRANTED**.

A separate order of judgment will issue.

Dated this 31st day of March, 2025.

_____
SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE

---

[9] Rev. Gray's failure-to-supervise claim fails for the same reasons. *See Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1216 (8th Cir. 2013) ("Under § 1983, 'a claim for failure to supervise requires the same analysis as a claim for failure to train." (quoting *Robinette v. Jones*, 476 F.3d 585, 591 (8th Cir. 2007)); *see also Perkins v. Hastings*, 915 F.3d 512, 523 (8th Cir. 2019) (no failure-to-supervise claim where plaintiff had not established a "pattern of similar constitutional violations").